**UNITED STATES of America, Appellee,**

v.

**Margaret A. VICKERAGE, Appellant.**

**No. 90–1400.**

United States Court of Appeals, Eighth Circuit.

Submitted Aug. 15, 1990.

Decided Dec. 4, 1990.

Rehearing and Rehearing En Banc Denied Jan. 14, 1991.

**144**

J. Joseph McQuillan of Walentine, O'Toole & McQuillan, Omaha, Neb., for appellant.

Michael Norris, Asst. U.S. Atty., Omaha, Neb., for appellee.

Before J. GIBSON, Circuit Judge; HEANEY, Senior Circuit Judge; and MAGILL, Circuit Judge.

HEANEY, Senior Circuit Judge.

Margaret Vickerage, a citizen of the United Kingdom, married Neil Clark, a United States citizen and Air Force officer, in 1988. Clark, however, was married at the time to another. As a result, the mar-

riage between Vickerage and Clark was annulled, but not before Vickerage had applied for permanent residency based on her marriage to Clark.

Vickerage's application, which was denied, formed the basis of a two-count indictment against her. The first count charged Vickerage with conspiring with Neil Clark (1) to enter into a sham marriage to circumvent and evade the immigration laws in violation of 8 U.S.C. § 1325(b); and (2) to make and present false statements with respect to material facts in the application and documents required by the immigration service in violation of 18 U.S.C. § 1546.[1] The false statements were contained in two of the documents Vickerage submitted to the Immigration and Naturalization Service (INS). The documents stated that Clark's previous marriage ended in 1977. This was only partially correct, as Clark had remarried after that date and remained married at the time of his marriage to Vickerage.[2]

Vickerage appeals from her conspiracy conviction. She contends that: (1) the evidence did not demonstrate the existence of a conspiracy between her and the co-conspirator, Neil Clark; (2) the jury instructions deviated from the indictment, thus violating her right to a fair trial; (3) the speedy trial act was violated, and (4) the sentence was excessive. We affirm the conviction and the sentence imposed.

We recite the facts in the light most favorable to the jury's verdict. Vickerage entered the United States in early 1987 on a six-month visitor's visa. She eventually made her way to Nebraska, where she rented an apartment and renewed a romantic relationship with a United States Air

---

**1.** Clark was an unindicted co-conspirator in Count I. By the time Vickerage was convicted, he had already been court-martialed for his part in the affair, spent 90 days in jail, and lost his retirement benefits.

**2.** Count II was not a conspiracy count; it simply charged Vickerage with presenting an application containing a false statement of material fact in violation of 28 U.S.C. § 1546. As in count I, Vickerage's allegedly knowing false statement was that Clark's marriage ended in

1977, when in fact he was still married to another. The jury acquitted Vickerage of Count II, indicating that the jury was not convinced Vickerage knew that Clark was still married to another when she applied for permanent residency. The jury, however, convicted Vickerage of Count I. Given her acquittal on Count II, it seems clear that the jury believed that Clark and Vickerage conspired to enter into a sham marriage, but not to submit false statements on the application forms.

Force Officer named Tresemer, who was married and based near Omaha.

Vickerage and Tresemer saw each other while Tresemer was in Nebraska and while Tresemer was on temporary duty elsewhere. While visiting Tresemer in Okinawa in January 1988, Vickerage met Neil Clark. Vickerage believed that her relationship with Tresemer was not working out, and she spent at least one night with Clark. Tresemer stated that the relationship between him and Vickerage became strained after this, and he eventually broke off his relationship with her.

Meanwhile, Clark and Vickerage kept in contact. Vickerage flew to Sacramento, California to see Clark over a weekend in September 1988.[3] During this weekend, according to Clark, Vickerage told him that she was willing to pay somebody $2,000 to marry her and stay married to her for two years and a day for the purpose of obtaining legal immigration status in the United States. Vickerage told Clark she had two possible suitors in Omaha in mind. By this time, Vickerage's visitor visa was due to expire in January 1989; it had already been extended several times and could not be extended again. In order to remain in the United States, Vickerage would need either to get a student visa or to marry a United States citizen.

Vickerage and Clark had a "somewhat difficult weekend" in Sacramento and parted on poor terms. Although the pair did not expect to see each other again, Clark called Vickerage out of "curiosity" about a month later. He asked Vickerage if she had indeed married one of her suitors in Omaha. Vickerage had not gotten married. Clark told Vickerage "Well, you know, I would like to see you again. Maybe I can help you out." Vickerage said, "What do you mean by 'help me out'? You mean get married?" Clark said, "If that's what it takes, perhaps". Tr. at 140. Clark suggested getting married in Reno because it would be fast and convenient.

According to Clark, Vickerage then took the initiative and made all the arrangements for the "marriage of convenience",[4] including a prenuptial agreement. Vickerage told Clark he would have to sign some immigration documents and that she wanted the marriage to be performed sooner rather than later, as a marriage performed some time before her visa expired would look better to the immigration authorities.

Vickerage and Clark met at a motel in Reno on November 25, 1988. According to Clark, he wanted to have sex with Vickerage immediately, but she insisted that he first sign immigration documents and go through the marriage ceremony. Clark complied with her desires. He gave Vickerage the information she needed to fill out the immigration documents and signed the documents. One of these documents asked for the names of Clark's former wives. Clark listed a former wife, but did not disclose that he was still married to another woman. Clark also gave a false address on the immigration form.

Clark and Vickerage left the motel, got married, and went back to their motel. Vickerage wrote Clark a $2,000 check. Clark testified he did not expect this check because he and Vickerage "hadn't really discussed any money". Tr. at 153. While Vickerage paid for everything associated with the marriage (motel, fees, etc.), there is nothing in the record to suggest that Vickerage ever told Clark that she would pay him $2,000 to marry her.

Clark woke up in a cold sweat during the night, having realized he "had really done something wrong" and that he "was about to commit a crime or something". Tr. at 154. He secretly exposed the film taken at the wedding, tried to erase the audio tape of the wedding, and put most of the immigration and marriage documents into his suitcase. In the morning, Clark told Vickerage that he was going to make copies of some of the documents. Instead, Clark took what he thought were all of the immi-

---

3. Although Clark testified that they saw each other in Sacramento in August, their letters indicate that the pair saw each other in September.

4. Clark testified that the term "marriage of convenience" was Vickerage's.

gration and marriage documents,[5] drove home to California, and destroyed the documents in his possession. He left Vickerage an envelope containing her birth certificate, the voided $2,000 check, and a note that said "I can't go through with this. I want out. Sorry. Neil."[6]

Vickerage contacted Clark several times and asked him to sign new immigration forms. Clark refused because "it was wrong. I was in too deep. . . . I was not going to help her out." Tr. at 160. Still, Vickerage applied for permanent residence in December 1988, based on her marriage to Clark. Vickerage subsequently withdrew this application in June 1989.

After reviewing the record, it is clear that the government presented evidence sufficient for a jury to conclude that Vickerage possessed the requisite criminal intent to enter into a sham marriage to circumvent the immigration and naturalization laws. Indeed, Vickerage conceded this at trial and in her brief. We also believe that the government presented sufficient evidence for a jury to conclude that Clark had aided and abetted Vickerage in her attempt to violate the immigration laws.

■ Vickerage contends, however, that the government did not prove that Neil Clark *conspired* with Vickerage to violate the immigration laws. Aiding and abetting, of course, requires different proof from conspiracy. *See, e.g., United States v. Mueller*, 663 F.2d 811, 813 (8th Cir.1981). To prove conspiracy here, the government had to show, among other things, that an *agreement* to violate the immigration laws existed between Vickerage and Clark. The government could not prove conspiracy simply by demonstrating that Clark somehow helped Vickerage to violate the immigration laws.

■ We believe that a reasonable jury could have concluded that Clark and Vickerage had agreed to enter into a sham marriage, the purpose of which was to circumvent the immigration laws. The crucial evidence demonstrating an agreement is Clark's September 1988 phone call to Vickerage. There, Clark offered to "help her out" by marrying her, and he suggested they get married in Reno.[7] Tr. at 140. Clark already knew that Vickerage had been willing to pay others $2,000 to stay married to her for two years and one day. Clark was aware that his marriage to Vickerage would be one of convenience only and that Vickerage needed either to get married or to get a student visa to stay in the United States.

We acknowledge that Clark also testified that the only agreement he had made with Vickerage was to meet her in Reno. He denied conspiring with Vickerage to defraud the INS. These statements, however, are not dispositive of the question of conspiracy, as they are legal conclusions in conflict with some of his other testimony.

We also acknowledge that Clark repeatedly stated that his only purpose in signing the immigration forms and going through the marriage ceremony was to have sex with Vickerage. He denied that immigration or anything else other than his desire for sex had anything to do with his actions. Even so, Clark still had to knowingly do certain things, such as sign immigration forms and to get married, before he was able to achieve his goal of having sex with Vickerage. While Clark testified that he considered the marriage ceremony a "hoax" and that he did not intend to go through with either the ceremony or the immigration process before or after meeting Vickerage in Reno, the fact remains that Clark did go through with the marriage ceremony and did sign the immigra-

---

5. Clark, however, left a "Petition for Alien Relative" form that he had signed behind.

6. Clark testified that when he wrote "I want out," he meant that he wanted out of the marriage.

7. Absent Clark's testimony about this phone call, we would conclude that the government presented insufficient proof of an agreement between Clark and Vickerage to violate the immigration laws. Marrying an alien to gratify one's sexual desires, in itself, does not establish the criminal intent necessary to be a part of a conspiracy to defraud the immigration service through a sham marriage.

tion papers with the knowledge that Vickerage was attempting to adjust her immigration status. This evidence, along with that discussed above, was sufficient to sustain Vickerage's conspiracy conviction.

■ Vickerage next contends that the jury instructions deviated from the indictment, thus violating her right to a fair trial. Vickerage's indictment was phrased in the conjunctive. It charged her with conspiring with Clark to violate two separate statutes, 8 U.S.C. § 1325(b) and 18 U.S.C. § 1546:

> ... by entering into a sham marriage the purpose of which being to defraud the United States by circumventing, defeating, frustrating and evading the [immigration and naturalization laws]; *and* by making and presenting false statements with respect to material facts in applications and documents required by the [INS].

Indictment at 1 (emphasis added). When it came time to instruct the jury, however, the instruction was phrased in the alternative, so that Vickerage could be convicted of conspiracy if the government proved either of the two offenses. Vickerage claims she relied on the conjunctive language contained in the indictment and that the disjunctive form of the instructions altered the government's burden of proof.

■ We disagree. An indictment must charge in the conjunctive, even if a statute is drawn in the disjunctive. Proof of any one of the violations charged conjunctively in the indictment will generally sustain a conviction. *United States v. McGinnis*, 783 F.2d 755, 757 (8th Cir.1986). When a conspiracy to violate two statutes is alleged, the jury may find the defendant guilty of conspiracy if it finds beyond a reasonable doubt that the defendant conspired to violate either one of the statutes. *United States v. Wilkinson*, 601 F.2d 791, 796 (5th Cir.1979). The district court instructed the jury that it had to agree unanimously upon which of the two offenses Vickerage conspired to commit, or both. We find no error in the district court's instructions.

We also reject Vickerage's claim that the Speedy Trial Act was violated because her trial began more than 70 days after her initial appearance. Vickerage's initial appearance was on August 22, 1989. The Speedy Trial clock began to run the next day on August 23, 1989, and continued until August 31, 1989, a total of nine days. On August 31, 1989, the magistrate granted Vickerage a continuance until September 5, 1989, and excluded the "time between August 31, 1989 and September 5, 1989." Vickerage does not contest the propriety of the magistrate's action.

■ We assume for this case that the Speedy Trial clock began running again on September 5 and was not tolled by a discovery motion brought by Vickerage in October. An additional 58 days thus elapsed through November 1, 1989, bringing the total days to 67. On November 2, 1989, the United States brought a motion to compel, which was granted the same day, thus excluding November 2 from the Speedy Trial calculation. 18 U.S.C. § 3161(h)(1)(F). The clock began running again on November 3, so the seventieth day fell on November 5, 1989, a Sunday. Because Vickerage's trial began on the next working day, there was no speedy trial violation. *See* Fed.R. Crim.P. 45(a); *United States v. Kramer*, 827 F.2d 1174, 1177 (8th Cir.1987).

■ Finally, Vickerage contends that the three-month prison sentence she received under the sentencing guidelines was mechanistically determined and excessive. Vickerage, however, does not argue that the guidelines were incorrectly applied or that her sentence was outside of the guideline range. The guidelines provide for a sentencing range of two to eight months when the Offense Level is 8 and the Criminal History Category is I. The district court did not abuse its discretion by imposing a three-month sentence or by deciding not to depart from the appropriate guideline range.

The district court's judgment is affirmed.