# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos.  96-3448/3774

_____

United States of America,                *
                                          *
          Appellee,                       *  Appeals from the United States
                                          *  District Court for the District
     v.                                   *  of
                                          *  North Dakota.
Wilbur D. Wilkinson,                      *
                                          *
          Appellant.                      *
                                          *

_____

Submitted:  May 20, 1997
     Filed:   September 5, 1997

_____

Before RICHARD S. ARNOLD, Chief Judge, BOWMAN and MORRIS SHEPPARD ARNOLD,
     Circuit Judges.

_____

BOWMAN, Circuit Judge.

     A jury found Wilbur Dale Wilkinson guilty of embezzling, misapplying,
and converting tribal funds from an Indian tribal organization in violation
of 18 U.S.C. § 1163 (1994); misapplying funds under the care, custody, and
control of an Indian tribal government receiving federal grants in excess
of $10,000 in violation of 18 U.S.C. § 666(a)(1)(A) (1994); knowingly and
willfully making false material statements in violation of 18 U.S.C. § 1001
(1994); and  aiding and abetting the above activities

in violation of 18 U.S.C. § 2 (1994). Having been sentenced by the District Court,[1] Wilkinson appeals his convictions. We affirm.

I.

The following facts are based on the evidence, with disputed questions of fact deemed to have been resolved by the jury in a manner that supports its verdict. Wilkinson was Chairman of the Three Affiliated Tribes (the Tribe) at all times relevant to the illegal activities charged in the indictment. The Tribe is located on the Fort Berthold Indian Reservation in North Dakota and qualifies as an Indian tribal organization under 18 U.S.C. § 1163 (1994). In July 1991, Wilkinson completed, signed, and submitted an application to the Bureau of Indian Affairs (BIA) for a Management and Technical Assistance grant for the purposes of hiring a consultant to assist the tribal loan office in resolving defaulted loans. The grant application stated that the Tribe would be responsible for hiring the individual consultant. As a result of this application, the Tribe received approximately $68,000 in 1992 and $105,000 in 1993. The $105,000 disbursement was made under the condition that the Tribe comply with special reporting and supervision requirements imposed by the BIA. These conditions were placed on the receipt of these funds after the Tribe neglected to comply with standard reporting procedures after receiving the $68,000 payment in 1992. A Commitment Order between the Tribe and the BIA outlining the applicable conditions was signed by Wilkinson on behalf of the Tribe.

The $105,000 check was received and endorsed by Wilkinson on behalf of the Tribe and deposited in a supervised account opened in the name "Three Affiliated Tribes and the Bureau of Indian Affairs, Technical Assistance." Signatories on the account included two tribal officials and two BIA officials; withdrawals from the

---

[1]The Honorable Patrick A. Conmy, United States District Judge for the District of North Dakota.

account required the signature of two parties--one from the Tribe and one from the BIA. Wilkinson was not a signatory on this account.

In September 1993, Wilkinson approached his nephew's wife, Kaye Wilkinson, and, promising to train her in the consulting business, offered her the position described in the grant application. In tendering to Kaye the proposed consulting agreement between her and the Tribe, Wilkinson represented, contrary to the terms of the proposed agreement, that she would receive ten percent of the proceeds earned under the agreement and he would receive the remaining ninety percent. Based on these representations, Kaye accepted the position and executed the consulting agreement, which provided that she would perform the consulting duties in return for an hourly wage and reimbursement of expenses.

Wilkinson presented this consulting agreement to tribal officials and the BIA superintendent and, without Kaye's knowledge, represented to them that Kaye needed a $20,000 advance for start-up expenses. Pursuant to Wilkinson's direction, the tribal credit officer, a signatory of the supervised account, prepared and signed a $20,000 check made payable to Kaye and obtained the requisite counter-signature of the BIA superintendent. Wilkinson then personally delivered this check to Kaye's home and, because Kaye was not there, demanded that her husband, Spencer Wilkinson Jr., endorse and deposit the check, keep $2,000 for Kaye, and return $18,000 to Wilkinson in cash. Spencer Jr., surprised at the size of the payment and worried about the potential tax consequences of the transaction, called Kaye who communicated her understanding that she was to receive only $2,000 and who could not explain why a check for $20,000 was issued in her name. Despite his misgivings, Spencer Jr. deposited the check and, rather than returning $18,000 in cash, wrote a personal check to Wilkinson for $18,000. Spencer Jr. testified that Wilkinson chastised him for his failure to obtain cash, but grudgingly accepted the personal check.

Kaye performed no consulting work, received no training from Wilkinson, and submitted no progress reports to the Tribe or the BIA for the next several months. Eventually, however, BIA officials began to wonder whether any work was being performed to justify the $20,000 advance payment made to Kaye. Officials called Kaye on a number of occasions inquiring about her progress on the delinquent loan accounts and Kaye, because she was expecting guidance from her uncle, called Wilkinson who informed her that he was on top of the situation.

In April 1994, Wilkinson delivered to Kaye handwritten reports summarizing the current status of some problem loans and requested that she type the reports. The information contained in these reports was derived from files obtained by Wilkinson from the tribal loan office and did not signify any progress on the resolution of the delinquent loans. Once typed, these reports, which provided little if any new information, were submitted to the BIA and represented by Wilkinson to be Kaye's work product under the consulting agreement.

Also in April 1994, Wilkinson procured seven blank consultant claim statements and had them delivered to Kaye at work. She was directed to sign the blank documents and return them to Wilkinson, which she did. Wilkinson then completed these forms with fictitious numbers of miles driven and hours worked by Kaye in relation to the consulting agreement for each month from October 1993 through April 1994. Wilkinson then presented these claim statements, totaling $7,972.25, for verification to tribal officials who signed them at Wilkinson's direction. A check was issued by the tribal credit officer and, after a cursory inquiry into the legitimacy of the claims, the BIA superintendent eventually counter-signed the expense check. Wilkinson delivered the check, issued in Kaye's name, to her home and, because Kaye was not there, presented the check to Spencer Jr. and insisted that he keep $2,000 for Kaye and return the remainder of the funds to Wilkinson in cash. Spencer Jr., having become even more suspicious of the arrangement, denied that Kaye had performed sufficient consulting work to warrant an additional $2,000 payment and consequently wrote a

personal check to Wilkinson for the full $7,972.25.  Spencer Jr. deposited the expense check in his and Kaye's joint checking account the next day.

An investigation was launched by BIA and FBI officials, leading to Wilkinson's indictment by a grand jury and his subsequent trial.

## II.

Wilkinson first argues that the District Court abused its discretion by withdrawing two exhibits from evidence at the close of his case.  Prior to trial, in an effort to expedite the presentation of the documentary evidence, the parties jointly prepared a binder containing the exhibits each side intended to rely on during trial.  The prosecution explained, and defense counsel agreed, that although the foundation for these exhibits had been established, their relevancy remained at issue and was to be determined during the trial.  The District Court understood that the parties had "reserved the right to object to relevancy on documents, even though foundation may have been established."  Trial Tr. Vol. 1 at 12.

Included in the jointly prepared binder was Exhibit 32, a bill of sale signed by Wilkinson and attested to by his brother, Virgil Wilkinson, purporting to establish that Wilkinson sold a 1992 Chevrolet Camaro to his nephew, Spencer Wilkinson, Jr. for $18,000.  Also included was Exhibit 47, a cash receipt for $7,972.25 signed by Wilkinson and attested to by Virgil.  During cross-examination of Spencer Jr., the defense attempted to show that the $18,000 personal check written to Wilkinson by Spencer Jr. was payment for the purchase of the Camaro and that the $7,972.25 check written to Wilkinson was repayment of a $6,000 loan made by Wilkinson to Spencer Jr. and a $1,792.25 earnest money payment from Spencer Jr. to Wilkinson for farm equipment.  Spencer Jr. specifically refuted these explanations for the checks, denying that he had ever borrowed money from Wilkinson and asserting that his father, Spencer Wilkinson Sr., rather than he, had purchased the Camaro from Wilkinson.  Defense

counsel did not attempt to impeach this testimony through the use of Exhibits 32 or 47 nor did defense counsel call Virgil, the attesting party on both documents, to corroborate the theory that Spencer Jr.'s checks to Wilkinson were for legitimate purposes.

Wilkinson called witnesses and presented a defense. At the close of his proof, the government informed the District Court that it intended to recall Spencer Jr. to rebut Wilkinson's theory that the two checks were written to Wilkinson for legitimate reasons and to discount the authenticity of the bill of sale and the cash receipt included in the evidence binder because neither document had been published or explained to the jury during trial. After a discussion in chambers, the government agreed not to recall Spencer Jr. if Exhibits 32 and 47 were withdrawn. Defense counsel objected, but the District Court eventually withdrew the documents noting that they were "completely irrelevant to any appropriate defense" and that "if . . . a kickback occurs, it is no defense that it occurred to pay a preexisting debt or obligation." <u>Id.</u> Vol. III at 428.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Relevant evidence is generally admissible, while irrelevant evidence is not. <u>See</u> Fed. R. Evid. 402. A district court's decision to exclude evidence is reviewed for abuse of discretion, and "[w]e will reverse only if the abuse is clear, and if the parties' substantive rights are affected." <u>Yannacopoulos v. General Dynamics Corp.</u>, 75 F.3d 1298, 1301 (8th Cir. 1996). The District Court excluded Exhibits 32 and 47 as irrelevant after determining that even if the documents tended to establish that Spencer Jr. owed Wilkinson a preexisting debt, repayment of that debt by structuring an illegal kickback scheme operates as no defense to the crimes charged in the indictment.

The parties only conditionally stipulated to the documentary evidence, specifically reserving the issue of the relevance of each exhibit for later determination

by the District Court.  The District Court did not abuse its discretion by excluding Exhibits 32 and 47 on the ground that they were irrelevant to any legitimate defense.

## III.

Wilkinson next argues that the superseding indictment was multiplicious and  that the District Court erred in failing to dismiss or consolidate the counts. We disagree.  An indictment is multiplicious when it charges a single offense in several counts.  "The vice of multiplicity is that it may lead to multiple sentences for the same offense."  United States v. Street, 66 F.3d 969, 975 (8th Cir. 1995)  (quoting United States v. Kazenbach, 824 F.2d 649, 651 (8th Cir. 1987) (further citations omitted)).  "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."  Blockburger v. United States, 284 U.S. 299, 304 (1932).  The Blockburger test is met "notwithstanding a substantial overlap in the proof offered to establish the crimes." Iannelli v. United States, 420 U.S. 770, 785 n.17 (1975).

Wilkinson was charged in one count with embezzlement of tribal funds in violation of 18 U.S.C. § 1163 (1994), in two separate counts with misapplication of tribal funds in violation of 18 U.S.C. § 666(a)(1)(A) (1994), and in two additional counts with making false statements in violation of 18 U.S.C. § 1001 (1994).   After reading and comparing the three statutes, it is apparent that each requires proof of several facts not required to establish the others.  Likewise, the separate counts under § 666(a)(1)(A) relate to two distinct violations of the statute, as do the separate counts under § 1001.  While overlapping evidence was presented to prove the violation of each count, this fact does not transform a properly charged indictment into an impermissibly multiplicious one.  Because each charge required proof of at least one element that the others did not, the indictment against Wilkinson was not multiplicious

and the District Court did not err by denying Wilkinson's motion to dismiss or consolidate the counts.

                                    IV.

Wilkinson makes a related argument that, because each count of the superseding indictment contained "multiple theories" upon which the jury could base its decision, the jury was permitted to render an ambiguous general verdict.  In support of his "multiple theories" argument, Wilkinson contends that Count I, for example, charged him "under at least three different theories -- embezzlement, misapplication of funds, and conversion."  Appellant's Br. at 9.  Count I charged Wilkinson with a violation of 18 U.S.C. § 1163 (1994), which provides in pertinent part that, "[w]hoever embezzles . . . knowingly converts to his use or the use of another, [or] willfully misapplies" tribal funds "[s]hall be fined under this title, or imprisoned."  Count I and, in fact, all counts of the superseding indictment, track the applicable statutory language.

Wilkinson draws our attention to United States v. Goodner Bros. Aircraft, Inc., 966 F.2d 380, 384 (8th Cir. 1992), cert. denied, 506 U.S. 1049 (1993), in support of his ambiguity attack on the general verdict, arguing  that "when evidence supports a jury verdict on one ground, but not another, and it is impossible to ascertain which ground was relied upon in reaching the verdict, that verdict must be set aside."  Appellant's Br. at 10.  Wilkinson's reliance on Goodner and other similar cases is misplaced.  In the first place, we are not persuaded that on any of the counts of conviction the evidence is insufficient to support the jury verdict on any of the alternative statutory grounds charged in the indictment.  Moreover, in Goodner and the other cases Wilkinson cites, a guilty verdict was overturned because the jury was presented with multiple theories on which to base conviction and one of the theories was legally incorrect.  See, e.g., Goodner, 966 F.2d at 384.  In those circumstances, because it was impossible to know whether the jury based its verdict on a sound theory or on the legally incorrect theory, the conviction was overturned.  See, e.g., id.  These

cases, however, do not support Wilkinson's assertion that the verdict must be set aside when the evidence is insufficient to support a general verdict as to one of a number of legally correct theories submitted to the jury, even though the evidence is sufficient to support the verdict on at least one of the theories.  In Turner v. United States, 396 U.S. 398, 420 (1970), the Supreme Court held that "when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged."  See also Griffin v. United States, 502 U.S. 46, 58-60 (1991) (noting that general verdict cannot be set aside simply because one of the possible bases of conviction is unsupported by adequate evidence).  Here, there is no allegation, nor could there be, that any of the "theories" under which Wilkinson was charged is legally incorrect.  Consequently, we conclude that Wilkinson's "multiple theories" argument must fail.

V.

Wilkinson next argues that the government presented insufficient evidence to establish that he had lawful possession over the funds he allegedly embezzled, converted, or misapplied; that the funds involved were tribal funds; or that he made material false statements.  On review, we must examine the evidence in a light most favorable to the government and uphold the conviction if  a reasonable-minded jury could have found guilt beyond a reasonable doubt.  See United States v. Easley, 70 F.3d 65, 67 (8th Cir. 1995), cert. denied, 116 S. Ct. 1338 (1996); United States v. Whitaker, 848 F.2d 914, 916 (8th Cir. 1988) (noting that evidence is sufficient if "there is substantial evidence to support the jury's verdict").  We conclude that the government presented sufficient evidence for the jury to return a guilty verdict on all counts of the indictment.

The indictment charged in Count I that Wilkinson "did embezzle, willfully misapply, and knowingly convert" tribal funds to his own use in violation of § 1163.  Wilkinson argues that, because the indictment charged in the conjunctive and the

government failed to prove that he was initially in lawful possession of the funds, a prerequisite to a conviction for embezzlement, his conviction must be set aside. We disagree. Although the indictment charged in the conjunctive, "[p]roof of any one of the violations charged conjunctively in the indictment will generally sustain a conviction." United States v. Vickerage, 921 F.2d 143, 147 (8th Cir. 1990). Furthermore, even if the government failed to prove that Wilkinson was initially in lawful possession of the funds, a proposition with which we do not necessarily agree, the government nevertheless presented sufficient evidence to establish that Wilkinson improperly misapplied or converted the funds to his own use.

Lawful possession of funds is unnecessary to support a conviction based on misapplication or conversion under § 1163. As to misapplication, Wilkinson offers us no authority for the proposition that lawful possession is an essential element of misapplication under § 1163, but there is authority for the contrary proposition. See, e.g., United States v. Hazeem, 679 F.2d 770, 772 (9th Cir.), cert. denied, 459 U.S. 848 (1982) (noting that misapplication does not require previous lawful possession). As to conversion, Wilkinson relies on United States v. Hill, 835 F.2d 759, 764 (10th Cir. 1987), which, citing Morissette v. United States, 342 U.S. 246, 272 (1952), held that "[o]ne who comes into possession of property by lawful means, but afterwards wrongfully exercises dominion over that property against the rights of the true owner, commits conversion." We cannot agree with the Tenth Circuit's, or Wilkinson's, definition of conversion. In Morissette, the Supreme Court explained the broader nature of conversion as contrasted with stealing. The Court noted, "Probably every stealing is a conversion, but certainly not every knowing conversion is a stealing. . . . Conversion . . . may be consummated without . . . any wrongful taking, where the initial possession by the converter was entirely lawful." Id. at 271-72 (emphasis added). Based on this discussion in Morissette, we cannot conclude that a conviction for conversion requires initial lawful possession of another's property. The knowing and unauthorized exercise of dominion over another's property, though possession is wrongful in the inception, is no less a conversion than is the knowing and unauthorized

exercise of dominion over another's property after possession is lawfully obtained.  See also 18 Am. Jur. 2d Conversion § 30 (1985) ("The unlawful taking of goods out of the possession of the owner with intent to convert them to the use of the taker is clearly a conversion.").  Consequently, we conclude that Wilkinson was not required to be in lawful possession of the funds in order to be convicted under § 1163 of either misapplication or conversion.

VI.

Wilkinson next argues that the government abused the grand jury process by refusing to disclose the testimony of an FBI special agent who was the sole witness before the grand jury.  The government counters that it did not release this transcript because it did not intend to, and did not in fact, call the agent as a witness during Wilkinson's trial.  In an attempt to obtain copies of this testimony, Wilkinson served a subpoena duces tecum on the government.  A motion to quash the subpoena was granted after the government stated that Wilkinson had been provided with copies of interviews and documents used during the agent's grand jury testimony, and that it was not required to release the transcript of the testimony. Grand jury transcripts need only be released by the government insofar as required under the Jencks Act, 18 U.S.C. § 3500 (1994), which provides: "no statement or report in the possession of the United States which was made by a Government witness . . . shall be the subject of subpena, discovery or inspection until said witness has testified on direct examination in the trial of the case," id. § 3500(a).  While the Federal Rules of Criminal Procedure authorize disclosure of grand jury transcripts under certain circumstances, see Fed. R. Crim. P. 6(e)(3), parties seeking such disclosure "must show a 'particularized need,' and the decision to permit disclosure lies within the sound discretion of the trial judge," United States v. Benson, 760 F.2d 862, 864 (8th Cir.), cert. denied, 474 U.S. 858 (1985).  We cannot conclude that the District Court abused its discretion in refusing to order disclosure of the special agent's grand jury testimony given that she did not testify at trial and that Wilkinson failed to show a particularized need for this testimony.

Wilkinson's related argument that it was error for the grand jury to indict based solely on the FBI agent's testimony is without merit. See United States v. Levine, 700 F.2d 1176, 1179 (8th Cir. 1983) (holding that grand jury may indict on whatever evidence is laid before it, even evidence that would be inadmissible at trial).

## VII.

Wilkinson also argues that during the trial the District Court made inappropriate comments that prejudiced the jury and affected the outcome of the trial. Because Wilkinson failed to object to these comments at trial, we review for plain error. Wilkinson takes issue with two comments made by the District Court in the presence of the jury. The Tribe's credit officer, who worked closely with Wilkinson, testified on direct examination that the handwriting appearing on the consulting agreement was Wilkinson's. During cross examination of the credit officer, the District Court stated, "You mean those terms that are in Mr. Wilkinson's handwriting?" Trial Tr. Vol. I at 164. Wilkinson argues that this comment effectively precluded the jury from making a determination that the handwriting was not Wilkinson's. This witness also identified as Wilkinson's the handwriting on the claims submitted on Kaye's behalf for reimbursement of mileage expenses and payment of hourly wages. The credit officer further testified that, according to the reports, Kaye worked each and every day in January, including weekends, except for January 25. The District Court remarked, "I have this terrible sense of humor, sir, but January 25th isn't a holiday on the reservation, is it?" Id. at 173. Wilkinson argues that this comment reflected the District Court's bias against him and affected the outcome of his trial.

We note that the District Court cautioned the jury before opening statements that "Questions from me are not evidence. Pleas [sic] do not assume that I hold any opinion on matters to which my questions may have related." Trial Tr. Vol. I at 31. We hesitate to disturb a judgment "'by reason of a few isolated, allegedly prejudicial comments of a trial judge.'" United States v. Lueth, 807 F.2d 719, 727 (8th Cir. 1986)

(quoting <u>United States v. Bland</u>, 697 F.2d 262, 265 (8th Cir. 1983)).  We conclude that the comments identified by Wilkinson, if objectionable at all, certainly do not amount to plain error requiring reversal.

VIII.

Although we forego discussion of Wilkinson's remaining arguments, we have considered carefully these arguments and find them to be without merit.

Wilkinson's convictions are affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT