# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-3352

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota |
| Lonnie Horse Looking, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: May 15, 1998

Filed: September 9, 1998

_____

Before McMILLIAN, NOONAN[1] and MORRIS SHEPPARD ARNOLD, Circuit
    Judges.

_____

McMILLIAN, Circuit Judge.

_____

[1]The Honorable John T. Noonan, Circuit Judge for the United States Court of
Appeals for the Ninth Circuit, sitting by designation.

Defendant Lonnie Horse Looking appeals from a final judgment entered in the United States District Court for the District of South Dakota,[2] upon a jury verdict, finding him guilty of one count of assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 113(a)(6), 1153; one count of assault resulting in substantial bodily injury to a child in violation of 18 U.S.C. §§ 113(a)(7), 1153; and two counts of aggravated sexual abuse in violation of 18 U.S.C. §§ 1153, 2241(c). United States v. Horse Looking, No. CR96-30102-01 (D.S.D. Aug. 21, 1997) (Judgment). The district court sentenced defendant under the federal sentencing guidelines to 405 months imprisonment, 5 years supervised release, a special assessment of $200.00, and restitution to be determined at a later date. For reversal, defendant argues that the district court erred in (1) denying his motion to suppress self-incriminating statements; (2) requiring a defense witness to be available to be interviewed by the government; (3) refusing to admit defendant's calendar into evidence; and (4) denying defendant's motion for judgment of acquittal. For the reasons discussed below, we affirm the judgment of the district court.

## Jurisdiction

The district court had jurisdiction pursuant to 18 U.S.C. §§ 1153, 3231. Defendant timely filed a notice of appeal under Rule 4(b) of the Federal Rules of Appellate Procedure. Jurisdiction is proper on appeal under 28 U.S.C. § 1291.

## Facts

This case involves the depraved assault and aggravated sexual abuse of a six-month-old child by defendant, her biological father. The following summary of facts

---

[2]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

is presented in the light most favorable to the government. All relevant criminal events occurred in St. Francis, South Dakota, in Indian country.[3]

Around January 5, 1996, the time charged in the indictment, defendant was approximately twenty-one years old, residing with his common-law wife, Nicole Bear Heels, in a small one-bedroom house in St. Francis. At that time, the couple had two children–the victim and a son. (Bear Heels later had a third child by defendant born after the trial). Between November 21, 1995, and January 6, 1996, defendant was unemployed and watched the two children while Bear Heels worked full time. Defendant did not routinely have friends over to the house, and there were no unfamiliar men or unfamiliar cars ever seen at the house. The couple had only one functional car at this time.

Shortly after defendant moved in with his family around November 1995 and assumed full-time responsibility for his two children, relatives began noticing visible

---

[3]"Indian country" is defined by federal law as

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151. Title 18 U.S.C. § 1153 gives federal district courts exclusive criminal jurisdiction over Native Americans who commit certain crimes within Indian country. Defendant is a Native American.

bruises and scratches on the victim.[4]  In late December of 1995 Bear Heels noticed that the victim would hold her leg up like it hurt her and had difficulty standing.  No one had noticed any of these problems before defendant moved in.

On Friday, January 5, 1996, Bear Heels was scheduled to work from 4:00 p.m. until midnight.  At approximately 3:30 p.m., immediately prior to leaving for work, Bear Heels changed the victim's diaper and did not notice anything unusual about the victim's vaginal or anal areas.  Bear Heels returned from work around 1:00 a.m. Saturday morning.  At around 10:00 a.m., Bear Heels changed the victim's diaper and noticed several bruises around her vaginal and anal areas.  Alarmed, Bear Heels immediately woke up defendant and demanded an explanation.  Defendant responded that he must have bounced the victim on his knee too hard.  The bruises had not yet peaked and would develop throughout the day into what an orthopedic surgeon would later testify to be "deep bruises suggestive of marked pressure or trauma."  Until this point, the victim was a normal, healthy baby.  Bear Heels had never seen such bruises on the victim any other time that the victim was in defendant's care.

Despite her observation of the bruises, Bear Heels chose not to seek medical care for the victim.  At about noon on Saturday, January 6, 1996, Bear Heels left the house and took her oldest child with her, leaving the victim alone with defendant. Some time in the early evening before Bear Heels returned, the victim stopped breathing.  Defendant was the only individual in the house with the victim when she stopped breathing.

The victim was taken in an ambulance to the Indian Health Service (IHS) hospital where Dr. Gunther Ruckl, a pediatrician with a fellowship in developmental pediatrics, treated her.  Dr. Ruckl found that the victim had a decreased level of

---

[4]For the first four months of the victim's life, she and her brother lived with their mother, Bear Heels.  Defendant did not live with them.

consciousness, that she was somnolent, and that she showed intermittent short seizure activity. He performed several procedures, including a spinal tap, and, upon seeing the victim's bruises, immediately suspected abuse. The spinal tap showed that the victim's fluid was cloudy, which Dr. Ruckl attributed to cerebral trauma. The victim's vaginal and anal openings were "severely bruised" and the victim's anal opening was so damaged that it could not constrict normally. Dr. Ruckl testified that defendant did not mention that anyone other than himself had recently watched the victim. Bear Heels testified that defendant was extremely nervous when he was talking with Dr. Ruckl.

Investigator Dennis Quigley of the Rosebud Sioux Tribal Police Station arrived at the hospital that evening. Dr. Ruckl told Quigley that the victim's deep vaginal and anal bruises were consistent with sexual abuse within the last 24 hours. Quigley then asked defendant who had babysat the victim during that time. Defendant told Quigley that he (defendant) was the only person who had watched the victim the afternoon and evening of Friday, January 5, 1996, and early Saturday, January 6, 1996. Defendant also told Quigley that no one else had recently babysat the victim. Defendant further stated that, on January 5, 1996 (the previous day), the victim did not have vaginal and anal bruises. Quigley noted that defendant did not seem to want to be near the victim or Bear Heels at the hospital. After speaking with Quigley, defendant asked a relative of Bear Heels to retrieve his clothes from the house because he thought that he would not be able to return to the house after this incident.

At or about 2:00 a.m., Sunday, January 7, 1996, the victim was flown from the IHS Hospital to Sioux Valley Hospital in Sioux Falls where Dr. Rita Rabenburg, a pediatrician, and a team of pediatric nurses treated the victim. Several of the pediatric intensive care nurses immediately gasped "Oh my God" when first seeing the victim's now deep purple vaginal and anal bruises. At trial, several doctors testified that the victim's bruises were consistent with recent forced sexual abuse. Dr. Rabenburg testified that, when she saw how bad the vaginal and anal bruises were, she was "shocked." She stated that the bruising appeared to be approximately 24-36 hours old

when she initially examined the victim. The victim was subjected to a battery of tests, including the administration of a rape kit. Dr. Rabenberg diagnosed three skull fractures, a subdural hematoma, an ischemic injury, perineal bruising, multiple long bone fractures, retinal hemorrhaging, and bronchiolitis. Sperm was found in the victim's vaginal area and inside her anus. DNA testing to identify the sperm donor was unsuccessful. The victim's hymen was not broken; however, there was medical testimony that that is not unusual on a six-month-old victim.

Over the course of the next two days, the victim was seen by a number of physicians, including orthopedic surgeon Dr. Daniel MacRandall, who performed a number of x-rays, CAT scans, and bone scans. The medical tests confirmed that three separate parts of the victim's skull had "acute" fractures that were inflicted within one day of her arrival at the hospital in Sioux Falls. In addition, both Dr. Robert DeClark, a radiologist, and Dr. MacRandall testified that the x-rays and bone scans showed that seven of the eight long bones in the victim's body were fractured. Dr. Rabenburg testified that the victim's skull fractures were life threatening. The doctors further testified that many of the fractures in the victim's long bones were in different stages of healing, indicating that the fractures had not all been inflicted at the same time. Dr. MacRandall testified that the skull fractures were approximately one day old as of Sunday, January 7, 1996, while the long bone fractures were approximately two to three weeks old. He labeled the fractures as "major fractures," and, along with Dr. Rabenburg, testified that the victim's injuries were consistent with "battered child syndrome." Drs. Rabenburg and DeClark also stated that they saw no evidence that the victim was suffering from any kind of "brittle bone" disease that could have caused such massive fractures.

Additional testing revealed that the victim had other problems. She had apparently been shaken so hard that she suffered a stroke, and had lost the ability to grasp things with her left hand. The doctors in Sioux Falls also discovered that the victim had great difficulty tracking objects with her eyes. Dr. Charles Mohler, an eye

-6-

surgeon, found no evidence that the victim was born with or had developed any kind of natural eye disease. He determined that the victim had conditions consistent with "shaken baby syndrome." His examination of the victim revealed that the retinas in both of her eyes had hemorrhaged. He testified that this hemorrhaging was consistent with a severe shaking. In fact, the right eye of the victim had hemorrhaged so severely than an operation was performed on March 14, 1996. The surgery was unsuccessful, however, and the victim is permanently blind in her right eye.

On Sunday, January 7, 1996, the victim was admitted to the Sioux Valley Hospital. The same day, Bear Heels called defendant who had not made the initial trip to Sioux Falls, had not come to Sioux Falls to see the victim, and had not telephoned to see how she was. During their conversation, Bear Heels asked defendant who had been with the victim in the last 24-48 hours. Defendant told Bear Heels that he was the only person who had watched the victim during that time.

The following day, on January 8, 1996, Investigator Quigley interviewed defendant at the Rosebud Sioux Tribal Police Department. At the start of the interview, defendant began speaking and Quigley immediately stopped him to advise him of his rights. Quigley produced a standard Advice of Rights form, stating the Miranda warnings, for defendant to review.

Quigley testified that he showed defendant the Advice of Rights form, read it to him, and witnessed defendant read it himself and sign it. Quigley then started the interview and specifically discussed with defendant who had babysat the victim late Friday evening, January 5, 1996, and early Saturday morning, January 6, 1998. Defendant told Quigley that he (defendant) was the only babysitter for the victim. Defendant also admitted that Bear Heels woke him up on Saturday morning and confronted him about the bruises to the victim's vaginal and anal areas. Defendant initially denied physically assaulting the victim; later he asked to start the interview over and eventually admitted that he "smacked" the victim on the buttocks area one

time while the victim was lying on her back. Defendant specifically denied ever sexually assaulting the victim.

The victim stayed in Sioux Valley Hospital the entire month of January and at other times during the following months. Bear Heels stayed with the victim during that time and, according to Dr. Rabenburg, was "very attentive" and concerned about the victim. Defendant never went to Sioux Falls or called Bear Heels or any of the victim's doctors to inquire about the victim's condition. At trial, defendant, who is approximately 6 feet tall and weighs 200 pounds, testified that he did not go to Sioux Falls because he was scared of Bear Heels's aunts. Defendant also testified that he did not visit the victim at the hospital because Bear Heels had Domestic Protection Orders against him prohibiting contact in Sioux Falls, South Dakota, and on the Rosebud Sioux Indian Reservation.

From the victim's permanent separation from defendant on January 6, 1996, until the time of trial there were no allegations or evidence of any new injuries to her. One year after the incident, the victim was still experiencing trauma from the abuse such as permanent and complete blindness in her right eye, partial paralysis, significant delay in her fine motor skills, and other effects of the stroke. At the time of trial, the victim was still in therapy.

On December 11, 1996, a superseding indictment was filed against defendant. Count I alleged that defendant committed an assault between December 6, 1995, and January 6, 1996, which resulted in serious bodily injury. Count II alleged that, during the same time frame, defendant committed an assault on a child that resulted in substantial bodily injury. Count III alleged that on or about January 6, 1996, defendant had vaginal sex with a child under twelve years of age. Count IV alleged that on or about January 6, 1996, defendant had anal sex with a child under twelve years of age. Various pretrial defense motions were denied. The case went to trial and the jury found defendant guilty on all counts. On April 16, 1997, the district court sentenced

defendant to 405 months imprisonment, calling the offense "the most heinous crime [he] ha[d] ever seen." Sentencing Transcript at 11. This appeal followed.

## Discussion

Motion to suppress

Defendant filed a pretrial motion to suppress certain statements that he made to Investigator Quigley during the January 8, 1996 interview at the Rosebud Sioux Tribal Police Station. The motion alleged that the Advice of Rights that defendant read and signed did not contain any information regarding his right to an attorney. The magistrate judge[5] addressed the suppression motion, among other things, at a hearing on March 7, 1997. At the hearing, defendant's attorney raised for the first time the argument that the challenged statements were made involuntarily. The government responded that it had no notice of this argument and was not prepared to address it at that time. Acting pursuant to the district court's referral order, the magistrate judge noted that there was, in fact, nothing in the suppression motion regarding involuntariness, Transcript of Suppression Hearing at 18-20, 27, and further noted that defendant had failed to move to amend the motion to include the argument of involuntariness even after the district court had granted defendant's motion to extend the deadline for filing pretrial motions. Id. at 28.

Treating defendant's newly-raised involuntariness argument as a motion to amend the suppression motion, the magistrate judge recommended that the same be denied as untimely and ultimately recommended denial of the suppression motion. Id. at 28-29. The magistrate judge made clear, however, that he did not deny defendant a voluntariness hearing because one was never requested; rather, the magistrate judge

---

[5]The Honorable Mark Moreno, United States Magistrate Judge for the District of South Dakota.

recommended that the suppression motion be denied <u>as filed</u> because the unambiguous Advice of Rights form that defendant read and signed clearly advised him of his right to an attorney.[6] <u>Id.</u> at 29. The magistrate judge gave both sides ten days from the service of the order recommending denial of the suppression motion to object to the report and recommendation. Defendant did not file any objections. The district court adopted the report and recommendation and denied the suppression motion, noting that defendant failed to file objections to the magistrate judge's report and recommendation and that the Advice of Rights form was unambiguous.

On appeal, defendant argues that the district court erred in denying his motion to amend his suppression motion to include the involuntariness argument because the

---

[6]The Advice of Rights form contained the following advisements:

> Before we ask you any questions, you must understand your rights.
>
> You have the right to remain silent.
>
> Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
>
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
>
> If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

Brief of Appellant at Addendum III.

untimeliness of his motion constituted mere procedural default.  See Brief of Appellant at 11.  In addition, defendant contends that the district court erred in adopting the magistrate's recommendation to deny the suppression motion as filed because defendant was not specifically advised that (1) he had an immediate right to an attorney and (2) if he could not afford one, the court would appoint one for him.  Defendant also asserts that there was no showing that he comprehended the salient facts regarding his rights.  In addition, defendant's attorney argued for the first time at oral argument on appeal that defendant was never informed that anything he said could be used against him in a court of law.  Therefore, argues defendant, the signed Advice of Rights Form is ineffective as a knowing and voluntary waiver of Miranda warnings and, as a result, his statements to Quigley should have been suppressed.  Defendant further asserts that the error in admitting the statements is plain in light of the fact that his statements were the only direct evidence against him presented by the government.  Defendant maintains that this "plain error" cures his failure to object to the district court's order under 28 U.S.C. § 636(b)(1)(C).[7]  Accordingly, defendant asks that this court reverse his conviction on all four counts.

The government argues that the text of the Advice of Rights form and defendant's reading and signing of the Advice of Rights form proves that defendant was duly advised of his rights.  Further, the government asserts that, even if we assume arguendo that defendant was not properly warned, the statements should not be suppressed as to the sexual abuse charges (counts III and IV) because the statements were not incriminating as to those charges.  With respect to defendant's involuntariness argument, the government asserts that defendant's failure to file a motion for a voluntariness hearing bars defendant from raising this issue on appeal.  In the alternative, the government argues that defendant's conviction should not be overturned

_____

[7]Title 28 U.S.C. § 636(b)(1)(C) provides that "[w]ithin ten days after being served with a copy, any party may serve and file written objections to . . . proposed findings and recommendations [of the magistrate judge] as provided by rules of court."

nor should defendant be granted a new trial because the evidence clearly shows that his statements were voluntary.

Generally, this court reviews for clear error the facts supporting a district court's denial of a motion to suppress and reviews de novo the legal conclusions based upon those facts. See United States v. Cunningham, 133 F.3d 1070, 1072 (8th Cir.) (citing Ornelas v. United States, 517 U.S. 690, 699 (1996)), cert. denied, 118 S. Ct. 1823 (1998). However, where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error. See Griffini v. Mitchell, 31 F.3d 690, 692 (8th Cir. 1994) (reviewing factual findings for plain error where litigant made no objections to magistrate judge's report and recommendation); see also United States v. Hall, 716 F.2d 826, 828-29 (11th Cir. 1983) (holding that defendant who failed to file timely objections to report and recommendation denying motion to suppress did not waive right to appeal ruling but may challenge the factual findings only under plain error standard).

The undisputed facts in this case show that defendant received proper Miranda warnings. Before answering any questions, defendant heard, read, and signed an Advice of Rights form that specifically advised him, among other things, that he had the right to remain silent or anything he said could be used against him in a court of law, the right to an attorney before and at any time during questioning, and the right to have an attorney appointed for him if he could not afford one. Based on these facts, we find no merit in defendant's allegations that he was not properly advised of the consequences of his statements and of his immediate right to a court-appointed attorney and that he did not comprehend the salient facts surrounding his constitutional rights. See United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990) (holding that a signed Miranda waiver form coupled with the officers' testimony constituted "substantial evidence" that the defendant was fully advised of his rights). Accordingly,

-12-

we hold that the district court did not err in denying defendant's motion to suppress <u>as filed</u>.

As for defendant's involuntariness argument, we hold that the district court did not abuse its discretion in refusing to allow defendant's untimely amendment to his suppression motion at the suppression hearing. Defendant failed to show good cause for his procedural default after having already obtained an extension of the deadline for filing pretrial motions. Moreover, defendant failed to object to the magistrate judge's recommendation that the motion to amend be denied. We therefore hold that the district court did not abuse its discretion in denying defendant's motion to amend and deem defendant's involuntariness argument waived under Rule 12(f) of the Federal Rules of Criminal Procedure.[8] <u>United States v. Casares-Cardenas</u>, 14 F.3d 1283, 1286 (8th Cir. 1994) (district court's refusal to consider untimely pretrial motions in criminal case is considered for abuse of discretion); <u>United States v. Garrett</u>, 961 F.2d 743, 748 (8th Cir. 1992) (holding under Rule 12(f) that district court did not abuse discretion denying motion to suppress as untimely where no good cause is offered for late submission).

<u>Mandatory interview of defense witness by government</u>

The morning before the second day of trial and outside the jury's presence, defense counsel disclosed to the district court and the prosecution a new witness, Lashawn Horse Looking, who was not on the defense witness list. Before allowing the witness's testimony, the district court directed that the witness "be made available to [the government] or to one of the FBI agents so that she can be interviewed." Trial

---

[8]Under Fed. R. Crim. P. 12(c), the district court may set "a time for the making of pre-trial motions or requests." If such a motion has not been filed by a party, that motion is deemed waived under Fed. R. Crim. P. 12(f), unless the party presents good cause for why the motion was not filed at the appropriate time. <u>See id.</u>

Transcript at 137. The witness was not present at this proceeding and there is no evidence in the record or any assertion by defense counsel that the witness was aware of the district court's directive. An FBI agent immediately interviewed the witness who was in a witness room at the courthouse. The witness later testified at trial that she was at defendant's house for two hours the afternoon of January 6, 1996, that defendant was alone with the victim when the witness arrived and when she left, and that the victim appeared pale and sick but otherwise happy. Id. at 318-23.

Defendant argues that the district court erred in requiring that the witness be interviewed by the FBI.[9] As a result of that interview, argues defendant, the government was able to develop aspects of the witness's testimony in violation of defendant's rights. Defendant notes that no reciprocal right was created for him with respect to the government's witnesses. Defendant therefore asserts that the district court committed plain error and his conviction should be reversed.

The government emphasizes that nothing in the record shows that the witness was aware of the directive or that she agreed to an interview because of the directive. The government contends that it is therefore impossible to find that the directive was error. Furthermore, the government argues that the witness's testimony was not probative of any disputed issues and was cumulative. The government further asserts that defendant has failed to show how the directive adversely affected his defense or the trial in general.

---

[9]Defendant also argues that, based on a misinterpretation of the disclosure requirements, the district court required that defense counsel disclose the witness to the government. Brief of Appellant at 13-14. The government denies that the district court directed disclosure of the witness and further points out that defense counsel voluntarily disclosed the witness to the district court in the presence of the prosecutor. Brief of Appellee at 31. The trial transcript supports the government's version of events. See Trial Transcript at 135-37. Accordingly, we reject defendant's argument as meritless.

-14-

This issue has not been properly preserved for appellate review because defendant failed to object to the district court's directive at trial. Ordinarily, we review the district court's decision to require defendant's witness to be available for interviewing by the government for abuse of discretion. Cf. Marti v. City of Maplewood, 57 F.3d 680, 683 (8th Cir. 1995) (holding that a district court's refusal to allow a witness not on the pretrial list to testify is reviewed under the abuse of discretion standard)). Assuming for purposes of analysis that the district court abused its discretion in requiring that the witness be available for an interview, we conclude that any error in the district court's directive was harmless because there was no evidence that the witness was aware of the directive, that her decision to talk to the FBI agent resulted from the directive, or that the interview somehow prejudiced defendant. See United States v. Hasting, 461 U.S. 499, 509 (1983) ("It is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations . . . ."); see also United States v. Lane, 474 U.S. 438, 446 n.9 (1986) ("The heightened regard we have for constitutional protections surely warrants a conclusion that nonconstitutional provisions must be treated at least comparably . . . ."). Moreover, the witness's testimony was not exculpatory. Her testimony merely confirmed defendant's testimony that the victim was "a little fussy," and that, except for the witness's presence, defendant was alone with the victim Saturday, January 6, 1995, from approximately 3:00 p.m. until 6:30 p.m. when he discovered that the victim had stopped breathing. See Trial Transcript at 286-87. We therefore hold that the district court did not commit reversible error in directing that the witnessed be interviewed.

Evidentiary ruling on calendar exhibit

Defendant next argues that the district court abused its discretion in refusing to admit into evidence defendant's Exhibit "A," a hand-written calendar prepared by defendant, his mother, his father, and his sister. Defendant asserts that the calendar showed when he alone watched his children, when he was not around his children, and

when both his mother and Bear Heels were around the children. Defendant argues that the calendar was a written memorandum of defendant's and his mother's contemporaneous notes and therefore was not hearsay. In excluding the calendar, defendant argues, the district court "materially deprived [him] of his ability to present admissible evidence that would contradict the Government's assertions." Brief of Appellant at 16. For support, defendant cites United States v. Bear Stops, 997 F.2d 451 (8th Cir. 1993), where this court held that the admission of evidence that casts doubt on whether the alleged sexual abuse could have been attributed to sources other than the accused might be constitutionally required.

Our standard of review regarding the exclusion of evidence is whether the district court abused its discretion and the party's substantive rights were affected. United States v. Wilkinson, 124 F.3d 971, 974 (8th Cir. 1997). A ruling on admissibility will not be reversed on appeal absent a clear and prejudicial abuse of discretion. See id. In the instant case, the district court refused to admit the calendar on the grounds that it was "hearsay and lacking in foundation." Trial Transcript at 346. Specifically, the district court held that defendant could not testify as to things told to him by others, whether it is written down or told to him personally, unless he knew of those things based on his personal knowledge. Id. at 248-49. We agree.

Both defendant and his mother testified that the calendar was based on conversations between four people–defendant, his mother, his father, and his sister. Defendant's father and sister did not testify at trial. Id. at 215, 219, 246. Further, defendant's mother, who allegedly wrote the notes detailing the victim's whereabouts during the six-month period, admitted that she had not seen the victim since the day the victim was born and could not communicate with defendant by telephone at his house because he and Bear Heels did not have a telephone. Id. at 221-22, 227, 235. Trial testimony also revealed that the calendar was assembled a week before trial and, thus, was not made contemporaneously with the dates depicted on the calendar. Id. at 246. Also, the calendar did not contain any reference as to which of the four people

(defendant, his mother, his father, or his sister) provided what information. <u>Id.</u> at 227. Finally, defendant testified that the calendar was not a summation of where the victim and the other individuals referred to in the calendar had actually been on the days depicted; rather, the calendar was a description of what defendant and his family members recalled had been planned to do on those days. <u>Id.</u> at 289-90. In light of the foregoing facts, we hold that the district court did not abuse its discretion in excluding the calendar.

<u>Sufficiency of the evidence</u>

At the conclusion of the government's case and at the conclusion of all the evidence, defense counsel moved for a judgment of acquittal on the ground that there was insufficient evidence. The district court denied both motions. Defendant now raises this issue on appeal. Specifically, defendant argues that there was no evidence that provided a nexus between him and the victim as to the assault charge in count II and the sexual assault charge in count III. Defendant notes that the semen detected on the victim from the rape kit was not conclusively attributable any particular individual. Similarly, defendant asserts that there is no conclusive evidence that the victim's head and limb injuries were caused by him. Defendant argues that there must be a greater showing of culpability than the "mere suspicion or possibility of guilt" to sustain his conviction. Brief of Appellant at 18.

We will reverse a conviction for insufficient evidence only if, upon viewing the evidence in the light most favorable to the government and accepting all reasonable inferences supporting the verdict, we conclude that no reasonable juror could find guilt beyond a reasonable doubt. <u>See</u> <u>United States v. Behr</u>, 33 F.3d 1033, 1035 (8th Cir. 1994). "We then uphold the conviction only if it is supported by substantial evidence." <u>United States v. Plenty Arrows</u>, 946 F.2d 62, 64 (8th Cir. 1991).

In contradiction of the government's evidence, Marie Horse Looking, defendant's grandmother, testified that defendant and his children had spent Saturday, January 6, 1998, with her. (On cross-examination, however, Marie Horse Looking changed her testimony and stated that Bear Heels must have brought the victim to her house on a different day.)  Lena Horse Looking, defendant's mother, testified as to defendant's non-violent nature and testified that defendant was away from his daughter a substantial amount of time.  Defendant contradicted some of Bear Heels's testimony by stating, for example, that the couple had another vehicle in addition to Bear Heels's, which allowed defendant to leave their residence.  Defendant testified that he would occasionally drop Bear Heels off at work and then take the family car for his own uses when his pickup was inoperable.  Defendant contradicted Investigator Quigley's testimony by denying that he told Quigley at the hospital that he alone had babysat  the victim on Friday, January 5, 1996.  In addition, defendant denied almost everything regarding his January 8, 1996 interview with Quigley on at the Rosebud Sioux Valley Police Station.  Defendant also denied that he told Bear Heels during their telephone conversation on January 7, 1996, that he was alone babysitting the victim on the Friday night and Saturday morning in question.  Finally, and perhaps most critically, defendant insisted three separate times during his sworn testimony that he was not alone with the victim that Friday night because Bear Heels was with him at home and was not at work.

Defendant's testimony on this latter point was contradicted, however, by Bear Heels's testimony that she was at work Friday night and left the victim with defendant, the testimony of the timekeeper at Bear Heels's job who introduced Bear Heels's time card showing that Bear Heels had worked from 4:02 p.m. on Friday, January 5, 1996, to 12:00 a.m. on January 6, 1996, and the testimony of a co-worker of Bear Heels's who corroborated the timekeeper's testimony, thereby diminishing defendant's credibility.  There was also testimony that defendant did not routinely have friends over to the house and that no unfamiliar men or unfamiliar cars were ever seen at this house.  Also, defendant admitted to several persons that he alone babysat the victim on January 5 and 6, 1996.  Moreover, there was substantial medical and lay testimony

regarding the longevity, severity, and suspected cause of the victim's injuries, all of which implicated defendant. Further, defendant offered no reasonable explanation for the victim's injuries while she was in his care and responded with disinterest upon learning of the victim's injuries. Finally, as demonstrated by the summary of facts, the amount of circumstantial evidence against defendant is overwhelming. We therefore conclude that the district court did not err in denying defendant's motions for judgment of acquittal.

**Conclusion**

For the foregoing reasons, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.