**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 16 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LEONARD MICHAEL CHACON,

Defendant-Appellant.

No. 98-2183

(D.C. No. CR-97-297-JC)
(District of New Mexico)

**ORDER AND JUDGMENT***

Before **PORFILIO**, **HENRY**, and **BRISCOE**, Circuit Judges,

Leonard Michael Chacon was convicted after a jury trial of committing an assault

Indian country by striking, beating, or wounding (a violation of 18 U.S.C. §§ 1152 and

113(a)(4) and an assault in Indian country resulting in serious bodily injury (a violation of

18 U.S.C. §§ 1152 and § 113(a)(6)).[1]  The government alleged and the jury found that Mr.

---

\* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[1] The conviction for assault by striking, beating, or wounding represented a lesser included offense of the §113(a)(7) violation charged in count I of the indictment.

Chacon committed the assaults on February 4, 1997 and February 20, 1997 and that the victim was Mr. Chacon's infant son.  The district court sentenced him to concurrent terms of imprisonment of forty-one months.

Mr Chacon now appeals his conviction and sentence for the February 20, 1997 assault, arguing that the evidence is not sufficient to support the conviction and that the district court erred in imposing a five-level enhancement of the offense level under § 2A2.2(b)(3)(E) of the United States Sentencing Guidelines.  For the reasons set forth below, we affirm Mr. Chacon's conviction and sentence.

## I.  BACKGROUND

In February 1997, Mr. Chacon lived in Sheep Springs, New Mexico (within the boundaries of the Navajo National Indian Reservation) with his wife Angelena, his wife's parents (Eleanor and Edward Jim), his wife's younger brother, and the Chacons' infant son, who was born in mid-January 1997.  On February 4, 1997, Angelena Chacon left the residence to do laundry, leaving the baby under her husband's care. Both of her parents were away from home.  When she returned, Mr. Chacon told her that their baby had fallen off a bed onto the floor.  Ms. Chacon noticed a dark red mark on the baby's  face but said that he seemed to be fine. However, when  Ms. Jim (Ms. Chacon's mother) returned home, she decided that the baby should examined by medical personnel.  Mr. and Ms. Jim took him to the Shiprock Indian Hospital.  The staff concluded that the baby was fine but

2

told the Jims to continue watching him.

On February 20, 1997, Mr. Chacon again cared for his son by himself. On that morning, Angelena Chacon left the house for fifteen or twenty minutes to go to the post office and the video store. When she returned, Mr. Chacon told her that the baby had been irritable and that he thought that the baby was hungry. After Ms. Chacon approached him, the baby emitted what she later described as "a loud screech." Rec. vol.. VI, at 524. When she picked him up, Ms. Chacon said, the baby went limp, his eyes started to roll, and he began to get pale.

Mr. Chacon testified at trial that his son had been irritable for the entire week preceding February 20, 1997. He stated that, on the morning of the 20th, he carried his son from the bedroom into the living room while his wife slept. Mr. Chacon explained that, when the baby began crying, he picked him up. Rather than moving his arms up, as he usually did, the baby "had no reaction whatsoever." Rec. vol. VIII at 657. Mr. Chacon cradled the baby, walked in a circle, and talked to him. At that point, Mr. Chacon said, the baby "let out this big cry" and seemed to have recovered. Id..

Later that morning, when Angelena Chacon left the house, Mr. Chacon heard the baby emit "a slow cry, like a moan." Id. at 662. He explained at trial that there was a tone to the cry that he had never heard before. He picked the baby up and began burping him. The baby then let out a loud screech. Mr. Chacon said that he held the baby and carried him around but was not sure what to do. He noticed that the baby had a dazed

3

look on his face.   When his wife returned, he told her what had happened.

The Chacons became alarmed and decided to take their son to the Tohatchi Indian Clinic.  The nurse who first examined the baby there testified that he was limp, blue, and looked as though he might stop breathing.  Clinic personnel inserted intravenous fluids and gave him oxygen. The pediatrician at the clinic reported that the Chacons' baby had a rash over much of his body and made jittery movements resembling seizures.  See Rec. vol. II, at 76-77.  She decided that the baby should be referred to the Gallup Indian Hospital in Gallup, New Mexico so that he could be more closely watched.

On her way home from work, the pediatrician at the Tohatchi Clinic began to think that the symptoms exhibited by the Chacons' baby might have been caused by a physical assault.  She called the attending physician at the Gallup Hospital to express her concerns.

At the Gallup Indian Hospital, a pediatrician thoroughly examined the Chacons' baby. She ordered an electrocardiogram, a chest x-ray, and a spinal tap.  The spinal tap revealed that the baby did not have an infection but that he did have a very high red blood cell count.  That raised the concern that the baby had suffered a cerebral hemorrhage, and, as a result, the pediatrician ordered a computed tomography (CT) scan of the baby's brain. She sent the results of the scan to a radiologist, who concluded that the baby had suffered an intracranial hemorrhage on the left side of the brain.   The  radiologist told the pediatrician that the hemorrhage had occurred within the last twenty-four hours.  Rec. vol. II, at 151.

4

In light of the severe complications that could result from an intracranial hemorrhage, the Gallup Indian Hospital pediatrician decided that the Chacons' baby should be transferred to University of New Mexico Hospital in Albuquerque. Transported by plane, the baby arrived in the early morning on February 21, 1997. Medical personnel admitted him to the intensive care unit.

The Chacons' baby remained in the University of New Mexico Hospital until February 27, 1997, undergoing several diagnostic tests. In particular, a pediatric radiologist performed a skeletal survey (an x-ray of every bone in the baby's body) as well as a nuclear bone scan (a test that reveals certain bruises and fractures that cannot be identified in a regular x-ray). Additionally, an opthamologist examined the baby's eyes

At trial, several of the physicians who examined and treated the Chacons' baby testified that his injuries were characteristic of a baby who had been violently shaken. In particular, the pediatric radiologist, after reviewing the CT scan that had been taken at Galllup Hospital, concluded that the location of the bleeding in the baby's brain was consistent with "Shaken Baby Syndrome." See Rec. vol. V, at 180. She testified that the skeletal survey revealed a healing rib fracture and an abnormal density in the bone leading to the right big toe. She subsequently concluded that the latter abnormality represented a healing fracture. Additionally, the radiologist said, the nuclear bone scan showed abnormalities where the ribs join the spine.

The opthamologist who examined the Chacons' baby found a massive preretinal

5

hemorrhage in his left eye. He also concluded that the hemorrhage was consistent with Shaken Baby Syndrome.

A pediatric pulmonologist who served as the attending physician on the subacute care unit (where the Chacons' baby was transferred on February 23, 1997) noted that when she first observed the baby, he had seizures, involuntary deviations of the left eye, thrusting motions of his tongue, and shaking of his extremities. She testified that the seizures and the high-pitched scream heard by the Chacons were signs that the baby had suffered an acute head injury. See Rec. vol. II, at 172-80. The Director of the Pediatric Intensive Care Unit at the University of New Mexico Hospital stated that he too had concluded that the Chacons' baby had suffered physical abuse. See Rec. vol. V, at 231.

Finally, the government presented testimony from a forensic pathologist. He described bleeding in the brain, rib fractures, and retinal hemorrhaging as three major signs of Shaken Baby Syndrome. Upon reviewing medical records of the Chacon's baby, he described him as "sort of a classic example of a battered child." Rec. vol II, at 70.

The government also offered testimony regarding the child investigation carried on by county, federal, and tribal officials. A county social worker testified that when she interviewed Mr. Chacon, he admitted that he was alone with the baby on the two days on which the injuries were observed. She also testified that Mr. Chacon appeared defensive during the interview and refused to be separated from his wife. An FBI agent who investigated the case testified that Mr. Chacon had told him that "accidents" do happen.

Rec. vol. IV, at 317.  The FBI agent also reported that Mr. Chacon had admitted that, on the morning of February 20, 1997, he had "jostled" his baby by tossing him in the air two or three times and that the baby had gone limp after he "jostled" him. Id. at 327. However, the forensic pathologist who testified for the government stated that the kind of "jostling" described by Mr. Chacon could not have caused the intracranial bleeding that the baby's doctors had uncovered.

Mr. Chacon testified that he had not caused the injuries to his son.  His attorney argued that the various injuries and abnormalities observed by the testifying physicians could have been caused by a variety of factors, including complications during delivery. Several of the physicians who testified for the government rejected that theory.

On February 27, 1997, the Chacons' baby was released into the custody of a foster family.  On March 12, 1997, after an investigation by tribal social workers and a ruling by the Navajo Tribal Court, the Chacons regained custody of their baby.

## II.  DISCUSSION

### A.  Sufficiency of the Evidence

On appeal, Mr. Chacon first argues that the evidence is insufficient to support his conviction for committing an assault on February 20, 1997 that resulted in serious bodily injury (a violation of 18 U.S.C. § 1152 and § 113(a)(6)). He maintains that "it is

medically impossible to pinpoint the time of the infliction of the injuries" to his son, see Aplt's Br. at 11, and notes that several people cared for his son in the days and weeks prior to the hospitalization. Focusing on certain expert testimony indicating that the baby's injuries could have occurred prior to February 20, 1997, Mr. Chacon asserts that the government's evidence does not establish that he was alone with his son when the injuries were actually inflicted. See Aplt's Reply Br. at 1.

In advancing this argument, Mr. Chacon "faces a high hurdle." United States v. Voss, 82 F.3d 1521, 1524-25 (10th Cir.1996). We review sufficiency of the evidence arguments de novo, asking "only whether, taking the evidence--both direct and circumstantial, together with the reasonable inferences to be drawn therefrom--in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." Id. at 1524-25 (internal quotation marks and citations omitted). We determine whether the evidence is sufficient "by 'consider[ing] the collective inferences to be drawn from the evidence as a whole.'" United States v. Wilson, 107 F.3d 774, 778 (10th Cir.1997) (quoting United States v. Hooks, 780 F.2d 1526, 1532 (10th Cir.1986)).

We are not persuaded by Mr. Chacon's reading of the record. As a preliminary matter, we note that "[i]n child abuse prosecutions, there are usually not eyewitnesses to identify the source of the injuries. Rather such prosecutions are commonly built upon circumstantial evidence . . . ." United States v. Leight, 818 F.2d 1297, 1301 (7th Cir.

8

1987); see also McGuire v. Estelle, 919 F.2d 578, 583 (9th Cir. 1990) (Kozinski, J., dissenting from the denial of petition for rehearing en banc) ("The fact is, child abuse cases are inherently difficult to prove: the evidence is usually circumstantial and often ambiguous; eyewitnesses seldom come forward because of family considerations, and the victims are often dead or too young to speak."), rev'd on other grounds, 502 U.S. 62 (1991); United States v. Boise, 916 F.2d 497, 499 (9th Cir. 1990) ("We acknowledge that the evidence here, as in most child abuse cases, is circumstantial. But if such evidence is of sufficient quality to convince a jury beyond a reasonable doubt, we require no more."). The government faced such difficulties here: the Chacons' baby was too young to describe what had happened to him, and, according to their trial testimony, no family members were present when the injuries were inflicted.

Nevertheless, in spite of these difficulties, the government presented credible expert testimony supporting its contention that the injuries to the baby occurred on February 20, 1997, when Mr. Chacon was the sole caretaker. In particular, several physicians testified that the baby's injuries–intracranial bleeding, a retinal hemorrhage, and fractures and bruises of the ribs--had been recently incurred.

We agree with Mr. Chacon that there is some testimony in the record that may be interpreted to support his contention that the injuries occurred sometime before February 20, 1997. For example, the pediatric radiologist who examined the results of the CT scan stated on direct examination that "on this particular scan we saw . . . blood that was, we

9

estimated, several days in age, at the outset, maybe even two weeks in age, maybe, but that's really pushing it." Rec. vol IV, at 222. However, there is other evidence that supports the government's theory. In particular, on cross-examination, the pediatric radiologist said of the blood detected by the CT scan, "It's possible that it is hours old. It's possible that it's several days old. What it isn't is several weeks old." Id. at 243-44. Additionally, the pediatrician at the Gallup Indian Hospital testified that the radiologist who reviewed the CT scan had reported that there "was definitely an acute bleed that occurred within the last twenty-four hours." Rec. vol. II, at 151. Accordingly, a reasonable jury considering this evidence could conclude that the Chacons' baby suffered an intracranial hemorrhage--as well as other injuries characteristic of Shaken Infant Syndrome--on February 20, 1997.

Moreover, the government presented evidence indicating that the baby only suffered symptoms of child abuse immediately after he was left in Mr. Chacon's sole care. The trial testimony revealed that Angelena Chacon's father and brother did not care for the baby by themselves. Although Ms. Chacon's mother did care for the baby, there was no indication of any child abuse symptoms after he was left alone with her. Thus, the timing of the baby's injuries also supports the government's allegations against Mr. Chacon. See United States v. Looking, 156 F.3d 803, 812 (8th Cir. 1998) (relying, in part, on evidence that individuals other than the defendant did not have the opportunity to commit child abuse in concluding that the evidence was sufficient to support assault and

10

sexual abuse convictions).

Finally, although Mr. Chacon advanced various theories regarding other causes of the baby's injuries, the government presented expert testimony refuting these alternative explanations. According to the Director of the Pediatric Intensive Care Unit at the University of New Mexico Hospital, it "would be impossible" for the baby's injuries to have been caused by medical procedures or traumas occurring at birth. See Rec. vol. IV, at 294. Even though Mr. Chacon testified that he did not assault his son, a reasonable jury weighing all of the evidence could reject that testimony and find that the government had proven its allegations beyond a reasonable doubt.

We therefore conclude that the evidence is sufficient to support Mr. Chacon's conviction for committing an assault resulting in serious bodily injury, in violation of 18 U.S.C. § 1152 and § 113(a)(6).


### B. Five Level Enhancement Under USSG § 2A2.2(b)(3)(E)

Mr. Chacon also challenges the district court's imposition of a five level increase in his offense level pursuant to USSG § 2A2.2(b)(3)(E). The district court's application of this provision to the circumstances of a particular case involves factual findings that we review for clear error. See United States v. Perkins, 132 F.3d 1324, 1326 (10th Cir. 1997).

Section 2A2.2 addresses sentences for aggravated assault and requires various

11

increases in the offense level based on the degree of bodily injury suffered by the victim. It requires a six-level increase if the victim suffered a "permanent or life-threatening injury" and a four level increase if the victim suffered a "serious bodily injury." If the injury is between these two categories, a five-level increase is required. <u>See</u> USSG § 2A2.2(b)(3)(E).

The terms "permanent or life-threatening injury" and "serious bodily injury" are defined by USSG § 1B1.1:

> "Permanent or life-threatening injury" means injury involving a substantial risk of death, loss, or substantial impairment of a function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent. In the case of a kidnaping, or example, maltreatment to a life-threatening degree (i.e. by denial of food or medical care) would constitute life-threatening bodily injury.

USSG § 1B1.1(h).

"Serious bodily injury" is defined as:

> injury involving extreme physical pain or the protracted impairment of the function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation. In addition, "serious bodily injury" is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or § 2242 or any similar offense under state law.

USSG § 1B1(j).

Section 1B1.1 does not provide a definition of the kind of injury falling in between these

12

two categories.

Here, the presentence report recommended a five-level increase in Mr. Chacon's offense level, concluding that the baby's injuries fell between "permanent or life-threatening" and "serious." The report noted that, according to the Director of the Pediatric Intensive Care Unit at the University of New Mexico (who testified at trial and at the sentencing hearing), the baby's injuries were life-threatening. "Had the victim not received immediate treatment for the bleeding inside the head, the bleeding would have continued." Rec. vol. XII, ¶ 32 (Presentence Report).

Mr. Chacon objected to this recommendation, arguing that he should not be held responsible for all of the baby's injuries because some of them occurred during delivery. At the sentencing hearing, Mr. Chacon sought to support this contention by presenting testimony from a pathologist who examined the baby's medical records. She stated that the baby had sustained an injury to the right temporal lobe of the brain that was separate from the intracranial hemorrhaging on the left side of the brain that was detected in February 1997. On cross-examination, the pathologist explained that the right temporal lobe injury probably occurred in utero and had nothing to do with either the intracranial bleeding, the retinal hemorrhaging, or the rib fractures identified by other physicians.

The Director of the Pediatric Intensive Care Unit at the University of New Mexico also testified at the sentencing hearing. He again stated that "in my opinion, [the Chacons' baby] was a victim of child abuse and that he was vigorously shaken and as a result

13

developed a life-threatening hemorrhage inside his brain." Id. at 47. He added that "there was a certain probability that with the onset of the seizures, the bleeding could have been worse and the swelling could have been worse and his brain function could have been severely affected." Id. at 48.

Upon considering this testimony, the district court stated, "The Court takes judicial notice the defendant assaulted his one-month-old son, causing serious bodily injury. And there is no doubt in my mind that this is serious bodily injury, and the correct level is 5, as set forth in the Pre-sentence Report." Id. at 76.

In our view, the district court's finding is not clearly erroneous. The testimony of an experienced pediatrician that the injury was life-threatening, the descriptions of the baby's injuries given by other physicians who testified at trial, and the fact that the baby spent six days in the hospital (including forty-eight hours in intensive care) support the imposition of a five-level increase under USSG § 2A2.2(b)(3)(E).

The district court's use of the phrase "serious bodily injury" (the phrase that the Guidelines use for injuries warranting four-level increases) does not undermine this conclusion. We construe the district court's findings in conjunction with the presentence report. So construed, the district court's ruling indicates that it agreed that the five-level increase was justified.

## III. CONCLUSION

Accordingly, for the reasons set forth above, we affirm Mr. Chacon's conviction and sentence.

Entered for the Court,


Robert H. Henry
Circuit Judge